ACCEPTED
04-14-00772-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
8/17/2015 10:44:28 AM
KEITH HOTTLE
CLERK

IN THE COURT OF APPEALS

FOURTH SUPREME JUDICIAL DISTRICT

SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
08/17/15 10:44:28 AM
KEITH E. HOTTLE
Clerk

| | | |
|---|---|---|
| JONATHAN JOSE GUILLEN | § | |
| VS. | § | NO. 04-14-00772-CR |
| STATE OF TEXAS | § | |

BRIEF FOR APPELLANT

On Direct Appeal from Cause No. 2013CR2647
In the 186TH District Court
Bexar County, Texas

ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza
San Antonio, Texas 78205
Telephone No. 210/227-5161
Telecopier No. 210/229-1243
alexjoss@yahoo.com
cindy@campionlawfirm.com

ALAN BROWN
State Bar No. 03090000
222 Main Plaza E
San Antonio, TX 78205
Telephone 210/227/5103
Fax 210/225/4851
alan@brownandnorton.com
cyndi@brownandnorton.com

1

## STATEMENT OF PARTIES

In accordance with Texas Rule of Appellate Procedure 72(a), for the purpose of disqualification and/or recusal of members of this Honorable Court, the following is a complete list of those parties involved in the instant action:

1) Jonathan Jose Guillen, Appellant

2) Alex Scharff, Appellate Attorney for Appellant; Trial Attorneys: Edward Camara Jr.

3) Tanner Neidhart, Nicholas Kemmy, Bexar County District Attorney's Office, for the State at trial; Appellate Attorney designate for Nicholas LaHood, District Attorney

4) The trial judge was the Honorable Maria Teresa Herr, of the 186th District Court.

# TABLE OF CONTENTS

Page

Statement of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Word Count of Compliance and Record References ............................5

Statement of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-48

**POINT OF ERROR ONE:** .................................................56
Summary of the Argument...............................................56
Standard of Review.......................................................57
Argument and Authorities................................................58
**POINT OF ERROR TWO:** ...............................................61
Summary of the Argument................................................61
Standard of Review.......................................................61
Argument and Authorities . . . . . . . . . . . . . . . . . . . 62
**POINT OF ERROR THREE** .............................................62
Summary of the Argument................................................63
Standard of Review........................................................63
Arguments and Authorities..............................................64
**POINT OF ERROR FOUR**................................................69
Summary of the Argument................................................69
Standard of Review........................................................69
Arguments and Authorities...............................................71
Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ....73

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74

# INDEX OF AUTHORITIES

**Texas Cases**                                                                                    Page

Alejandro v. State, 493 S.W. 2d 230 (Tx. Crim App.1973)                                    59
Allen v. State, 2015 Tex. App. Lexis 8144 (Tex. App. Houston [14] 2015). . . 68
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)
       (Op. On reh'g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
Bauder v. State, 921 v. 696 (Tx. Crim App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 62
Borjan v. State, 787 S.W. 2d 53 (Tx Crim App. 1990) . . . . . . . . . . . . . . . . . . .60
Brandley v. State, 691 S.W. 2d 699 (Tx. Crim. App. 1985. . . . . . . . . . . . . . . . . . 57
Brown v. State, 270 S.W.3d 564,570  (Tex. Crim. App. 2008) . . . . . . . . . . . 59
Cantu v. State, 939 S.W.2d 627 (Tx. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . .57
Ex Parte Miller  330 S.W.3d 610, 618 (Tex. Crim. App. 2009) ). . . . . . . . . . . .67
Fant-Caughman v. State, 61 S.W. 3d 25 (Tex App. Amarillo 2001). . . . . . . . . . . . 57
Franklin v. State, 459 S.W.3d 670  (Tex. App. Texarkana 2015). . . . . . . . . . . . 57
Gaddis v. State, 753 S.W. 2d 396 (Tx. Crim. App. 1988). . . . . . . . . . . . . . . . . . 60
Gonzales v. State, 115 S.W.3d 278 (Tex.App- Corpus Christi 2003, pet.ref'd)  60
Hawkins v. State, 135 S.W. 3d 72 (Tx. Crim. App. 2004). . . . . . . . . . . . . . . . . . .61
Jenkins v. State, 625 S.W.3d 324 (Tex. Crim. App. 1981) . . . . . . . . . . . . . . .65
Ladd v. State, 3 S.W.3d 547 (Tx. Crim. App. 1999). . . . . . . . . . . . . . . . . . . . . . . .61
Martinez v. State, 17 S.W.3d 677 (Tx. Crim App. 2000). . . . . . . . . . . . . . . . . . . .58
Massey v. State, 1999 Tex. App. LEXIS 7372 (Tex. App. San Antonio1999)  60
McCandless v. State, 57 S.W. 672 (Tx. Crim. App. 1900). . . . . . . . . . . . . . . . . . .72
Mosley v. State, 983 S.W.2d 249 (Tx.Crim.App. 2000). . . . . . . . . . . . . . . . . . . 57
Ramirez v. State, 2015 Tex.App.LEXIS 6743 (Tex. App. Corpus Christi 2015).57
Reeves v. State, 420 S.W.3d 813 (Tx.Crim.App. 2013). . . . . . . . . . . . . . . . . . . . . 70
Simpson v. State, 119 S.W.3d 696 (Tx.Crim.App. 2003). . . . . . . . . . . . . . . . . . . .61
Stell v. State, 711 S.W.2d 746 (Tx. Crim App 1986). . . . . . . . . . . . . . . . . . . . . . .60
Tate v. State, 981 S.W.2d 189 (Tx. Crim.App. 1999). . . . . . . . . . . . . . . . . . . . . . .64
Thompson v. State, 659 S.W.2d 649 (TX.CrimApp. 1983). . . . . . . . . . . . . . . . . . .64
Torres v. State II, 71 S.W.3d 788 (Tx. Crim.App. 2002). . . . . . . . . . . . . . . . . . . .63
Torres v. State, 117 S.W.3d 891 (Tx.Crim.App. 2003). . . . . . . . . . . . . . . . . . . . . .68
Willover v. State, 70S.W.3d 841 (Tx.Crim.App. 2002). . . . . . . . . . . . . . . . . . . . . .64
Wilson v. State, 90 S.W.3d 391 ((Tex. App. Dallas 2002). . . . . . . . . . . . . . . . . . . .64

Statutes
Tex. Rule Evid.404(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

Tex. Code Crim.Pro. 37.07...............................................................................61

Tex.R. App.Proc. 44.2...............................................................................57-8

## RECORD REFERENCES

In this brief the Clerk's record will be as follows: (CR-page); references to the court reporters's statement of facts will be cited as follows: (RR-page). Should there be multiple volumes, the volume number will cited–e.g. [fourth volume] as (4RR-page). Trial exhibits will be cited to the volume number and to the number of the exhibit, e.g. (3RR-SX 34)

## WORD COUNT CERTIFICATION OF COMPLIANCE

Pursuant to T.R.A.P. 9.4(i)(3), the word count, from the beginning with the Statement of the case on page eight until, but excluding the signature block is 16630. This is a computer generated document created in WordPerfect X4, using 14-point interface for all text, except for footnotes, which are in 12 point typeface. The word count is provided by the software and is relied upon by the undersigned.

## STATEMENT OF THE CASE

Benito Garza, hereinafter referred to as Appellant, appeals his conviction for murder, enhanced by a prior felony conviction and 99 year sentence out the 186th District Court of Bexar County, Texas, in cause number 2013CR2647, Honorable Judge Maria Teresa Herr, presiding. Appellant was sentenced by the jury to serve 99 years in prison with a $0 fine. The jury found it to be true that Appellant had been once before convicted of Possession of a Controlled Substance in an amount over four grams but less than 200 grams. The Judge sentenced Guillen accordingly. A Motion for New Trial was filed, but no hearing was held. The Appellant timely gave notice of appeal.

IN THE COURT OF APPEALS

FOURTH SUPREME JUDICIAL DISTRICT

SAN ANTONIO, TEXAS

---

JONATHAN JOSE GUILLEN          §

VS.                            §          NO. 04-14-00772-CR

STATE OF TEXAS                 §

BRIEF FOR APPELLANT

---

On Direct Appeal from Cause No. 2013CR2647
In the 186TH District Court
Bexar County, Texas

ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza E
San Antonio, Texas  78205
Telephone 210/227-5161
Telecopier 210/229-1243

ALAN BROWN
State Bar No. 03090000
222 Main Plaza E
San Antonio, TX 78205
Telephone 210/227/5103
Telecopier 210/225/2481

7

## STATEMENT OF FACTS

The Appellant was charged in a one count indictment for the the offense of the murder of Ernest Garcia, enhanced by one prior felony conviction. (CR-5). Paragraph A alleged that on December 13, 2012, Guillen intentionally and knowingly cause the death of an individual, namely, Ernest Garcia, by shooting him with a firearm. (CR-6) Paragraph B alleged that on December 13, 2012, Guillen, with intent to cause serious bodily injury to Garcia, did commit an act clearly dangerous to human life that caused Garcia's death, by shooting Garcia with a firearm. (CR-6) The indictment also alleged Guillen had been previously convicted of felony possession of a controlled substance "PG 1 4-200 grams." (CR-6)

Prior to jury selection, the trial court heard Guillen's Motion to Suppress the search of two different locations, "Apartment 2201 and 234 Carmen Street," a motion to suppress Guillen's statement and then several motions for discovery. (2RR-5)

San Antonio (SAPD) Detective Adam Soto stated he was dispatched to 2334 Austin highway, Apartment 2201 on December 13, 2012 in response to a call. (2RR-8) He observed police officers setting up a perimeter, and standing in front

of the door to preserve the crime scene. (2RR-8) Soto stated that officers were already inside the apartment, with one near dead body in the master bedroom. (2RR-9) Soto said Lisa Martinez, the resident of 2334 Austin Highway, apartment 2201 was present and signed a consent to search form. (2RR-11-2) Soto stated the police searched Guillen's room inside the apartment where he found a box of ammunition and a handgun box. (2RR-16) Soto admitted that he did not obtain consent to search Guillen's room. (2RR-16) SAPD Detective James Zepeda stated he traveled to 234 Carmen Place on December 26, 2012 to execute an arrest warrant for Guillen (2RR-18-9) Zepeda went to the residence, knocked on the door and obtained a consent to search from Matthew V. Garcia. (2RR-21) After entering, Guillen was found and arrested. (2RR-21) He obtained written consent to search from Garcia and Jessica Garcia. (2RR-23) However, neither Guillen nor his girlfriend were asked, or gave consent to search the room where Guillen was arrested. (2RR-27) In the same room, Zepeda found a notebook "(and a gun pack or a case or something like that)." (2RR-27). Zepeda also found an instruction manual for a Smith and Wesson and a spiral notebook. (2RR-28) SAPD Sergeant Jesse Salame stated he interviewed Guillen on video. (2RR-30) On the video, .Salame read Guillen his Miranda rights, and Guillen acknowledged he understood them, however Salame never asked Guillen if he wanted to waive his rights. (2RR-

9

33, 42) During the interview, Salame told Guillen, "I know there's two sides to every story. You know, I only heard one side of it." (2RR-34) Guillen responded "I know my lawyer advised me, you know, to keep my mouth shut or whatever." (2RR-35) Despite some other conversation, Salame testified that Guillen never invoked wanting a lawyer or suspended the interview or ask to bring in his lawyer. (2RR-35-6). Salame requested a DNA sample from Guillen but he said "Yeah, I'll wait for my lawyer for all that." (2RR-37) Salame eventually left the room and "CPS" investigator Chuck Paul talked to Guillen. (2RR-38) The CPS worker asked Guillen "What address is good for you?" to which Guillen responded 4858 Encanto Creek. (2RR-39)

Both sides argued as to whether Guillen had a reasonable expectation of privacy in the bedrooms located in the Austin Highway address and in the Carmen address. (2RR-42-56) The trial court did not make a ruling at that time but gave the attorneys a week to research the issue. (2RR-57) The trial court did rule that Guillen's videotaped statement was admissible generally but indicated that either the parties would make their own redactions on the video concerning inadmissible evidence, or that she would. (2RR-57).

Another pre-trial hearing was held where the parties argued over what statements should be redacted from Guillen's interview. (3RR) The defense lawyer

objected to the Judge's allowing the inclusion of Guillen saying " I've been trying to walk a righteous path. It was weird because the baddest shit I did this whole year," but no grounds for objection were articulated.(3RR-9-10) The trial court also delayed ruling on other requested redactions. (3RR-14).

After the jury was empaneled and sworn, the State called Lisa Marie Martinez, Appellant Jonathan Guillen's mother. (6RR-55) She stated she had been living in the Oak Manor Apartments on Austin Highway for nearly two years in December of 2012. (6RR-56) She stated the deceased, Ernest Garcia, was shot at that residence, was not attacking Guillen when shot, and that Ernest did not have a gun or weapon in his hand. (6RR-56) She testified Garcia was going towards Guillen when he was shot, but that when Garcia was shot, his hands were in the air.(6RR-56) She claimed Garcia was not going towards her, threatening her, or attacking her when Garcia was shot.(6RR-57) Martinez said her son Guillen, his girlfriend Gloria, along with their son Jonathan had been living with her for about three weeks prior to the shooting. (6RR-57) She said Guillen had stayed with her "on and off." (6RR-57) She stated on December 12, 2012, Martinez heard Garcia knocking on the door, and knew he was coming to her house because he had called to tell her he was on his way. (6RR-58) She was in her room talking on the phone to her husband, whom had just been released from prison. (6RR-59) She filed for

11

divorce against her husband while he was in prison and started "seeing" Garcia for a "couple of months.." (6RR-59). Although she wanted to be with Garcia, she told Guillen not to open the front door until she "got off the phone." (6RR-60) She claimed she hung up the phone right away and told Guillen to open the door, so he did. (6RR-60) Guillen and Garcia were in the living room together for about five minutes, talking about the Spurs game they were watching on the television. (6RR-61) Martinez exited her bedroom, saw Garcia, then they both went back to her bedroom, closed the door, and laid on the bed for ten to fifteen minutes. (6RR-61-2). Then "things went bad" when Garcia "snorted cocaine." (6RR-62) Garcia had already been drinking when he arrived. (6RR-63) The two started arguing because Garcia wanted Martinez wanted her to "do the line, another line–a line [of cocaine]" (6RR-63). She stated she did not want to snort the cocaine because she had already taken her pills to go to sleep and did not want to mix the cocaine with her medication. (6RR-63) Garcia then became upset at her because she had "hickeys" on her neck, so he "smacked" her in the neck and her hair, as well as hitting her in her neck with the back of his hand. (6RR-63) She claimed he was hitting her "not soft but not real hard." (6RR-63) She denied crying out at that moment but then later Garcia punched her in the face three times, so she started crying, but not loudly or trying to get attention. (6RR-63). Garcia had her in the

corner by the closet door and was grabbing her by the neck. (6RR-63). Garcia kept telling her to "Call the police, call your fucking husband," but she kept telling him that she was not going to call anyone, but that she wanted him to leave." (6RR-64) Garcia would not let her go as he was holding her down to the ground, trying to make her pick up the phone, bur she would not. (6RR-64). When the police arrived, Martinez told the police that Garcia had hit her. (6RR-67).

When Garcia was pushing her head and yelling at Martinez to call the police or her husband, Guillen knocked on the door. (6RR-68) She saw Guillen open the bedroom door and observed Garcia holding Martinez down on the ground, then Garcia let go of Martinez and walked over to shut the door .(6RR-68). Guillen asked his mother three times if Garcia had hit her, but she refused to answer because she did not want Garcia to beat Jonathan up.(6RR-70-1). At the same time Garcia was trying to close the bedroom door, Guillen was attempting to keep the door open, and succeeded by putting his foot by the door to keep it open.(6RR-73). Guillen asked his mother if she was alright and was telling Garcia to leave.(6RR-73). Garcia tells Guillen, "Let me deal with your mom, then I'll fucking deal with you, boy," as he was trying to get Guillen away from the door.(6RR-73-4). Martinez said Guillen was standing in the hallway holding a gun telling Garcia to get out.(6RR-78). The bedroom door re-opens, with Garcia standing by the

13

footboard of the bed and Guillen standing outside the the door holding the gun down. (6RR-79). Garcia started walking towards Guillen with his hands in the air, getting close to the door with Guillen stepping back.(6RR-84) Garcia told Guillen "...basically, like to get out. Like he was–he wanted to close the door again and Jonathan just kept telling him, Just get the fuck you, just leave. And Ernest didn't want to. And Ernest started walking up on Jonathan and Jonathan started backing up.(6RR-84) Again, Garcia told Guillen to let him deal with Martinez now and that he would "fucking deal with you later, boy."(6RR-85) Guillen was backing up telling Garcia to get back, but Garcia kept walking up to Guillen.(6RR-85) As Guillen was backing up more to the other door, Guillen shot Garcia with the gun.(6RR-85) Garcia did not fall down after the first shot.(6RR-85) Martinez explained, "I was by the end of the footboard because I was trying to get out of the room. When I was trying to get out, Ernest put his hand like to block me so I wouldn't pass him, and the gun went off and it just kept going off repeatedly. When I look, Jonathan had his eyes closed and he was firing....and Ernest fell after a few shots" (6RR-85-6). Martinez stated she never saw the gunshots hitting him because Garcia still kept walking, "He never–he didn't fall." (6RR-86) However, Martinez did say she saw Garcia fall on his stomach. (6RR-87). Martinez then ran to Garcia and stayed beside him. (6RR-89). Martinez stated Garcia did not have a

14

weapon with him that night, and over objection, stated Guillen did not have to shoot Garcia. (6RR-90).

After the shooting, Guillen stayed in the hall, but Gloria and her child left the residence.(6RR-90). Guillen told Gloria to take the baby to Martinez' sister's house, that he was going to stay. (6RR-90) Guillen told his mother to call the police "Because he thought I was going to get in trouble. And Gloria kept screaming 'You're going to get me in trouble.' And he's like, 'I can't leave my Mom here, she's going to get in trouble." (6RR-90) Martinez ran to her neighbor's residence to ask her to call the police, and when she returned, ultimately Guillen, Gloria and the baby left in her car. (6RR-91) Martinez did not talk to Guillen after that night for months. (6RR-96).

Martinez admitted she has lupus, severe arthritis and a joint disease, and had been sick for twelve years. (6RR-96) She explained that she had to be resuscitated twice before, and had been on life support for four weeks. (6RR-96) Ten months after that, she "got together " with Garcia. (6RR-97) She stated she was living with Garcia for five weeks before Guillen moved in with her. (6RR-97). However, Martinez took away Garcia's key to the residence after her husband was released from prison. (6RR-126, 128) Garcia's daughter had informed Martinez that Garcia was "a bad guy" a month into their relationship, but that she never told Guillen

15

about the conversation. (6RR-98-9) Martinez stated she met Garcia at the end of October 2012, a short time before his death.(6RR-98). She said Guillen was living with her before Garcia moved in but that he would stay at her sister's residence because Martinez did not like Gloria. (6RR-98)

When Martinez was talking to the police, she told them Gloria was not there because, "she was always with us, her father is a police officer, and the gun was under her name and she didn't want to get in trouble and I didn't want problems with her dad." (6RR-98).

That evening, after the shooting, Martinez admitted lying to the police by saying "that that's what he [Guillen] got, because I was mad at him. I wanted them to get him—arrest him." (6RR-100). She also admitted that Garcia was not speaking nicely to Guillen when he was telling him to get out of the room.(6RR-102). She confessed to making complete falsehoods about Guillen in her police statement because she was mad at Guillen, and wanted to punish him (6RR-113). On the night of the shooting, Martinez admitted to taking Vicodin, Xanax, Soma, plus cholesterol medicine. (6RR-114). During that day, she took about twenty pills. (6RR-115) She also admitted to using cocaine with a friend earlier in the day as well. (6RR-116). In addition to having lupus and rheumatoid arthritis, Martinez also stated she had fibromyalgia, high blood pressure, diabetes, joint degenerative

16

disease. (6RR-118) She also admitted to having trouble with her right eye, problems with her kidneys and her liver which malfunction, and that Guillen knew of her diseases and suffering.(6RR-118) She stated that in the last twelve years, she had broken fourteen bones, and that Guillen was aware of this. (6RR-118)

Martinez' husband, Frank was released from prison early in 2012, but was sent back to prison. (6RR-128). She stated that in early December, 2012, Garcia stated he did not like Frank, so he bought a gun and told her and Guillen he was going to use it on Frank. (6RR-128) In fact, Garcia had flashed a gun at Guillen in front of Gloria. (6RR-128) She admitted Garcia stated in front of Guillen, Martinez, and Gloria that "I've got this gun and I'm going to take care of Frank if he comes around her." (6RR-128) Martinez stated Garcia had moved his gun from the trunk of the car into the apartment where the shooting happened. (6RR-129). Martinez testified that she and Guillen knew Garcia could be very dangerous when he drank alcohol. (6RR-129).

On the day before the shooting, Martinez admitted spending hours together with Frank, where the two got "very friendly," enough to where Frank had made several "hickeys" on her neck. (6RR-131) She admitted that because of her medical conditions, the hickeys are larger and take a longer time to go away. (6RR-132). She said she went home about 2 p.m. after spending time with Frank, when she got

together at her friend's apartment and "did" cocaine with her until around 5 p.m. for four hours.(6RR-132-3). She then stated she went home to see Garcia because he was waiting to see her. (6RR-133) She testified Garcia was getting angry because Martinez wasn't home and he didn't know where she was. (6RR-133). When she finally returned to her home, nobody was there, but Guillen came home from the emergency room with the baby, who was suffering from breathing problems as well as having a cold. (6RR-134). Martinez admitted Guillen had been at the hospital the entire time she had been romantic with Frank and using cocaine. (6RR-134). Gloria was also with Guillen when he came home around 10 p.m.. (6RR-135). She stated Garcia was not at home when Guillen, Gloria, and the infant arrived home. (6RR-135) Martinez had arrived back home after using cocaine at her friend's house shortly before Guillen came back from the hospital. (6RR-135) Guillen took the baby to his bedroom to change the baby's clothes and to give the child a bath, as he always did. (6RR-136) Martinez went to her room and answered a phone call from her husband, Frank. (6RR-136) Garcia then arrived. But Martinez had already taken her Xanax, Vicodin, and Soma all together. (6RR-137) She stated that she usually falls asleep within five minutes after she takes that pill combination. (6RR-137) Garcia called Martinez on the phone to tell her that he was coming. (6RR-137) She added that he had been

calling her when she was at her friend Betty's house. (6RR-138) When he called, she was already talking to Frank on the phone, however she did not want Garcia to come in because she did not want him to see the hickeys she had received from Frank, the husband she said she had filed to receive a divorce (6RR-138). She told Garcia not to come over, but to just watch the Spurs game at his mom's and that she would see him in the morning. (6RR-138) However, Garcia did come over and knocked on the door while Guillen was watching the Spurs game in the living room and Gloria was putting the baby to sleep in the other room. (6RR-139). As Garcia aggressively knocked on the front door, Guillen came to Martinez and talked to her. (6RR-139) She told Guillen not to let Garcia in until she finished her phone call with Frank. (6RR-149) After she completed the call, she told Guillen to let Garcia in, so he did, and Garcia was very angry and drunk when he entered. (6RR-141). Martinez reiterated that she and Guillen knew Garcia became very violent when he is drunk. (6RR-142) She also stated Guillen did not want Garcia to come inside but Martinez told him to let Garcia in even though she knew Garcia and herself would have a "nasty" argument. (6RR-142). She also admitted she did not want Guillen to see the argument because she knew Guillen would pry to protect her and Garcia would hurt Guillen. (6RR-143) Garcia slapped her on her face and neck and even punched her on the bottom of the jaw, so much he damaged

19

her jaw. (6RR-145-6) Garcia was very angry at her and told her to call the police and her "bitch ass pussy [husband] to come over here." (6RR-148). She started crying but Garcia continued to assault her, so Guillen came to the bedroom and opened the door.(6RR-146-7). She then stood up, continued crying, and was bleeding from her mouth due to Garcia's punches under her jaw. (6RR-149) Guillen asked her if Garcia had been hitting her but she gave no answer, leaving Guillen to "make up his own mind as to what was going on." (6RR-150) Guillen told Garcia to "get out of there. You've got to go." (6RR-150) Garcia told him "No, I'm not going to." (6RR-150) Guillen again asks him to leave, saying "Please leave, man," but Garcia stayed. (6RR-151) Guillen tells Garcia a third time to leave, but Garcia became angry at Guillen and turned his anger away from Martinez to Guillen, telling Guillen, "I'm talking to your mom. Let me deal with your mom and I'll fucking deal with you later, boy...[yelling] like if he was like a man and Guillen was like a kid." (6RR-152) Martinez agreed that Garcia spoke to Guillen "ignorantly...Like he was mad...He's telling him to mind his own business, get out of there or he's going to kick his ass, too..."(6RR-152)

Martinez was walking towards the door but Garcia prevented her from leaving the room, then tries to close the door by pushing the door shut.(6RR-153) Guillen blocks the door, then Garcia lunged at Guillen, which "looked like he was

going to hit him." (6RR-153) Garcia lunged at Guillen and they were struggling at the door, but Guillen finally gets the door open and tells Garcia to "get the fuck out."(6RR-154) Martinez denied that Garcia had his hands up when he approached Guillen. (6RR-154) Garcia still keeps walking like he want Guillen to get out of the room. (6RR-154) Martinez admitted she was on the floor and could not see Guillen clearly but could hear what was going on and could see Garcia. (6RR-155).

Martinez admitted she was "pretty high" on drugs when she spoke to the police that night. (7RR-11). She admitted telling Officer Sandoval that after she and Garcia went into the bedroom when the argument started but that she and Garcia went outside and argued some more. (7RR-13) She also stated that she and Garcia went back into the bedroom, but denied, then did not remember, telling the Officer the door was locked. (7RR-15-7). She also did not remember that she told the Officer that Guillen tried to open the door but that it did not open. (7RR-17) She additionally did not remember telling the Officer whether she, Garcia, or Guillen had opened the door. (7RR-18) Moreover, she did not remember telling the Officer that Garcia did not hit her, that he only shook her. (7RR-19). She did remember telling Officer Sandoval that immediately after Guillen asked her if she had been hit and she did not respond, that Guillen pulled a gun, pointed it at Ernest who was standing in front of the television in the bedroom. (7RR-27; SX 4). She

21

did admit to telling the jury that when Guillen came into the room that Garcia was by the phone charger pushing her head down into the floor but that she told Officer Sandoval that Garcia was actually doing nothing at the time, just standing just in front of the television. (7RR-27-8). She denied telling Sandoval that after Guillen brandished a gun, she and Ernest told him to calm down and put the gun away. (7RR-28). She again denied telling the Officer that after Guillen was told to put the gun away that guillen refused to do it. (7RR-30) . She also did not remember telling Sandoval that she turned away because she was afraid Guillen was going to shoot her, but admits she may have said such, although she was not worried that Guillen would shoot her. (7RR-30-1). She admitted lying to Officer Sandoval when she told him that after the shooting that Guillen said "That's what the bitch gets." (7RR-31) She said she lied because she was "pissed off" that her son shot somebody that "I was in love with." (7RR-32). She admitted saying many bad untrue things about Guillen at the time to the police because she was angry at him. (7RR-32) She also revealed that she never told the police that Gloria had been there and left. (7RR-33) Martinez acknowledged that her desire when speaking to the police was to punish Guillen. (7RR-33).

Martinez also talked to Officer Soto about the events of that night, and admitted she told Soto many things that night that were completely different from

22

really happened. (7RR-35). She denied telling Soto that when Garcia was hitting her, he was telling her to call for Guillen, but then stated that maybe she did tell the Officer such. (7RR-36) She admitted that she told Officer Soto that Guillen had the gun in his shorts but that she actually "made that up." (7RR-38) In fact, she plainly stated she "made up stuff," and that she lied. (7RR-39). She conceded that she never told Detective Sandoval or Soto anything about Garcia holding his hands up. (7RR-39) She admitted she "flat out" told the two Detectives that Guillen came into the bedroom and started shooting. (7RR-40).

She was then interviewed by Detective Salame at the police station, and told him that Garcia was a member of the "Eme [Mexican Mafia]." (7RR-42) Defense counsel tried to ask her if she remembered telling Salame that Garcia would hit her when he was drunk, but the trial court sustained the State's objection. (7RR-43) She conceded that she told the Detective that Guillen had threatened her and "pulled out a gun on her before," but that both were lies. (7RR-44) She again admitted she embellished the story because she mad at Guillen. (7RR-45). In fact she admitted fabricating to the Detective that Guillen had pulled a gun and held it to her head several times in the past. (7RR-45). She confessed that she and Garcia had been arguing all day but that when Garcia came over that evening, the argument started getting bad. (7RR-47). However, she said Garcia told her he was

sorry for hitting her before Guillen came into the bedroom. (7RR-49) But then she tried to clarify that Garcia did not say he was sorry, rather he kissed her on the top of her head where he punched her "like he was sorry." (7RR-50) Interestingly though, she told the detective Garcia continued to hit her and even choked her when Guillen entered the room. (7RR-50). She stated she didn't remember telling Salame that after Garcia apologized to her, that Guillen was at the door and Garcia opened the door for him, let him in and said, "We're just talking." (7RR-50). In fact she claimed she did not even read her typed statement before she signed it. (7RR-51) She even confessed "there's a lot of stuff I didn't say and I still signed it." (7RR-52) She revealed that Garcia only had his hands up when he was going towards Guillen.to grab Guillen to get him out of the room. (7RR-52).

The week before the trial, she spoke to the Assistant District Attorney about how her story had changed and about how many other things she told the police weren't true. (7RR-54) She stated she was worried that the prosecutor was mad, and did not know if she was going to get in trouble or not, so that is why she never said that Gloria was present at the scene. (7RR-54)

Martinez revealed she had spoken to female reporter from KENS-TV several days after the incident and told her that Guillen reacted because Garcia was hitting her and would not stop. (7RR-57) She also said Guillen was just trying to protect

24

her from Garcia, who was drunk and would not stop hitting her. (7RR-58) She admitted that when she was interviewed, she was not high on medication and was telling the actual truth. (7RR-59)

Martinez, Guillen's mother, sent him a letter in which she wrote she knew he did it [the shooting] only to protect her. (7RR-65).

Martinez admitted telling the prosecutor that Guillen did not need to kill Garcia, but that she did not think Guillen planned to kill Garcia, that he was scared and reacted. (7RR-68) She revealed in detail that Garcia was a big person with large hands that were all the way around her neck. (7RR-70) However, she then said she was not being choked, but that Garcia had her on the ground with his hand around the back of her neck holding her to the floor. (7RR-71). She testified Garcia punched her three times, once on the side of her chin, on the side of the head and then smashed her on the side of her face. (7RR-75). Martinez stated she did not remember everything she told the police the night of the shooting because she had taken medication and was falling asleep. (7RR-81) She lied about Gloria not being at the scene of the shooting "Because her dad was a police officer, she was always throwing her dad thing around, and the gun was under her name. She was like, her dad was going to be pissed off. I didn't want problems or her dad harassing me and stuff. (7RR-84) She admitted lying about Gloria but stated, "She

never came out of the room. The door was never even opened. So it's not like she had did–could have seen anything." (7RR-84) Guillen's mother did say that Gloria was yelling, "Let's get out of here." (7RR-84).

Martinez related that Guillen had, prior to the shooting, moved out for about two weeks, and that when he returned, she had allowed the decedent to live with her.(7RR-88).

The State had created a similar door as a demonstrative aid for the jury, as well as to allow Martinez to show where she, Guillen, and the decedent were situated in the room during the time of the altercation.(7RR-89). She clarified that only Guillen's arm was in the room holding a firearm, not his entire body, including his feet. (7RR-96) Martinez claimed as Guillen was at the door, the decedent was walking towards Guillen with his "hands up," with Ernest saying, "Let me talk to your mom and then I'll deal with you later, boy."(7RR-98) Guillen was telling him at first to get out, to "just leave, man," with Ernest saying "Whatever," followed by Guillen telling him to, again "Get out," and at the end Guillen "was like, Get the fuck out." (7RR-98) She said Guillen was talking calmly at first, not hysterically.(7RR-98) She stated Ernest was closer to Guillen at the door when Guillen shot the first bullet." (7RR-99) She continued, "Ernest kept coming towards him, Jonathan backed up a little bit. At first Ernest put one hand

up, then he had the other one, and Jonathan started shooting and I–when I looked at him, he just was shooting. He [Guillen] had his eyes closed and the gun never stopped." (7RR-99) She remembered turning away after the first shot as she thought Guillen was going to shoot her too because he was not aiming. (7RR-99, 151) She added that it looked as if Ernest, who was mad, was moving aggressively towards Guillen to "hit him." (7RR-102-3) She reiterated that everything happened so fast.(7RR-141).

Dr. Jennifer Jean Rulon, a medical examiner, interestingly, stated she works for, "the person who died suddenly, unexpectedly and their family. And that's really who I care about. I also care about the jury in cases that have a criminal implication. But I don't work for anybody else....the police...the prosecution...the defense. (7RR-157) She performed the examination and autopsy on Ernest Garcia, number 12-2385. (7RR-158) She revealed Garcia was five foot eleven inches tall and weighed 223 pounds and looked to be the stated age of forty-four years of age. (7RR-162) She related Garcia had many tattoos, but she believed them not to be important. (7RR-162-3) She noticed he had an old "inch or two" healing bruise on the inside of his left knee as well as an "inch or two" long scratch on his left upper anterior chest that was a scab. (7RR-163) She claimed she did not see any bruises or scrapes on his knuckles. (7RR-165) She found ten gunshot wounds and one

27

graze wound to Garcia's body, but not necessarily from ten bullets. (7RR-165)

Gunshot wound (hereafter "GSW") one entered Garcia along his right upper anterior chest, through the right lung, the heart, the left lung, from front to back, right to left, and downward, but was "stuck" in the skin of the back, so she pulled the bullet out. (7RR-172,4) She stated the bullet's impact caused much bleeding in each chest cavity, which would have caused pain and trouble with breathing. (7RR-175) However she did say one could still stand if they had sustained this specific type of bullet wound. (7RR-175) She reiterated that she had no way of knowing the order of the gunshots. (7RR-175) GSW two entered down below the right nipple, travels just under the skin very superficially and exits to the left of the nipple. (7RR-178) She said the impact was not as lethal as GSW one. (7RR-179) GSW three was on the top of the left shoulder but she could not determine from where it entered or exited, front to back or left to right. (7RR-179-80) She stated GSW three only caused injury under the skin, similar to GSW two, and not life threatening. (7RR-179) GSW four was located on the right buttocks up towards the center part and towards the upper part of the buttocks. (7RR-181) It went through the bones of the pelvis, some of the organs in the abdomen, the stomach, got stuck in on the front of the stomach wall, so she recovered it. (7RR-182) She stated it went from back to front, from right to left and upward. (7RR-182) GSW five entered to the

side of GSW four and traveled in the same fashion as GSW four, but went through the liver somewhat and came to rest on top of the liver, so she recovered it as well. (7RR-183) GSW six was close to five on the buttocks but down some, and followed a similar path to GSW's four and five, but almost exited the skin and was right under the skin's surface on the lower chest, and was recovered. (7RR-184) She testified GSW six's impact would have been a rapidly fatal wound that traveled from back to front, from right to left and upward. (7RR-184-5) GSW seven created a hole in the side of the right hip and was stopped within inches by the bone, and was recovered. (7RR-185) She said GSW seven traveled from right to left, very slightly upward. (7RR-186) GSW eight went upward, exited the skin going from back to front, right to left. (7RR-198) GSW nine was on the front of the body, was traced to run up the inside of the abdomen, coming to rest in the deep muscle of the pectoral muscle of the chest wall on the right after going through the liver, where she recovered the bullet. (7RR-186) She summarized that GSW four, five, six, and eight were "all going from his back to front, from his right to left and upward." (7RR-186) GSW ten went through the left hand, entering on the back of the left thumb over the joint and exiting through the palm surface. (7RR-187) She claimed there was evidence of close range firing of GSW three. (7RR-192) She stated there was no evidence of close range firing on

Garcia's hands. (7RR-195) She testified many of the wounds Garcia received were very "rapidly lethal" from which he could not have survived. (7RR-206). She agreed that she could not envision the positions of the shooter and Garcia, but that one possible position causing a close range wound could be shoulders lunging towards the firearm. (7RR-207).

Cristina Vachon, a forensic scientist from the Bexar County Crime Lab stated she performed a trace evidence analysis of Garcia's black hooded "Tapout" shirt, white t-shirt, and blue jeans. (8RR-17, 45) Specifically she was examining the clothes for gunshot residue to try to determine a distance of fire. (8RR-17) She stated she found gunpowder around four holes, or "defects" in the black shirt as well as up on the left shoulder and the front defects but did not see any gunpowder on the defects on the back of the black shirt. (8RR-23, 30) She found most of the gunpowder in the right front chest area, with less on the shoulder area. (8RR-40) She estimated the barrel was between two and five feet away from the black shirt when fired. (8RR-28) She admitted she did not perform any test firing of the firearm used in the case nor any examination to see if there was any gunshot residue on Garcia's hands. (8RR-38) She concluded because there was a difference in the amount of gunpowder on the front area of the shirt and the shoulder part, that indicated there was movement by Garcia, but she could not speculate as to the type

or amount. (8RR-41-2) In fact, her testimony was based solely on her experience and not on test firing of the same weapon and ammunition on the same kind of material as the clothing, which she stated was the scientifically most accurate way to determine distance of firing. (8RR-49-50)

Crime Scene Investigator from the San Antonio Police Department (SAPD) Detective Brian Anthony Peters stated he was the second CSI unit dispatched to the apartment where the shooting occurred. (8RR-60) When he arrived, Garcia was on the floor on the left side of the bed in the bedroom. (8RR-61) He found only one shell casing outside in the hallway directly outside the bedroom, another underneath the left boot of Garcia. (8RR-64) A spent bullet was found under the left side of the bed near the head two or three feet from Garcia., as well as another spent bullet underneath the night stand next to the bed by Garcia. (8RR-64) Spent casings were found on the opposite side of the bed from where Garcia lay and four casings were found on the bed and in other places in the bedroom.(8RR-66-8) Peters affirmed that while no gun was found in the apartment, a box in another bedroom in which a Smith and Wesson gun was shipped was located. (8RR-73-4) Inside that box was a shell casing purportedly shipped by the manufacturer with the weapon. (8RR-74) Peters embarrassingly admitted he made a sketch of the scene but he lost the original, yet recreated the sketch after viewing other photo

31

exhibits. (8RR-77-8)

Brittany Garcia, Ernest Garcia's twenty year old niece stated she remembered watching a news story about a shooting at the apartment complex where Ernest lived, so she and her mother went there, but the deceased had already been "taken."(8RR-94) She saw Martinez' face and claimed she did not have any bruises, appear to be in pain, have scratches, black eyes, a bloody nose, no swollen face and was talking normal. (8RR-95-6) Interestingly, Brittany said she merely showed up to the apartment with the door open and went inside during cross examination but stated on direct examination, she never entered the apartment. (8RR-94,99)

Tammi Louise Sligh, a forensic scientist in the Firearm and Tool Mark Section, testified a gun was never recovered to compare to the eight found spent cartridge cases or projectiles but that all were shot from the same weapon, a Smith and Wesson Sigma Series forty caliber weapon. (8RR-108) She also stated that for a bullet to fire from a semi-automatic weapon, the trigger must be pulled for each shot. (8RR-133) She stated she was not aware if anyone traced the gun that came in the Smith and Wesson box back to the original purchaser. (8RR-136)

Before the jury heard a telephone call Guillen made while in jail, the trial court heard arguments about the legal admissibility of it, and made redactions to

inadmissible portions, but admitted it over defense counsel's objections. (9RR-17)

San Antonio Police Officer Christopher Johnson, testified he was in the first group of officers who responded to the dispatch for a shooting in progress on the day in question. (9RR-24) After arriving, he went inside the apartment and spoke to a female that he "believed" to be the decedent's girlfriend. (9RR-25) He remembered speaking to her face-to-face inside the dwelling. (9RR-25) He "did not remember" seeing any injuries on her: bruises, "busted lip," dry blood, or swollen tongue. (9RR-26) He did say he remembered the decedent centered between the bed and the left wall face down. (9RR-27) He stated he arrived before EMS (Emergency Medical Services) did, so when they appeared, they moved the body in order to treat him. (9RR-27) Before he transported the unidentified female to police headquarters so she could give a statement to detectives (of which he had no memory of the names, she was upset but talking with Johnson and other officers, but "he did not believe" she treated by EMS. (9RR-28) After she was interviewed, he transported her to a friend's house, and claimed she never complained of any pain or injuries, but "did not see any injuries, that I remember." (9RR-29) Officer Johnson also did not remember which officers were there or in what order they arrived. (9RR-31) He stated he saw no civilian, specifically a young twenty year old female, enter the area. (9RR-43)

SAPD Detective James Zepeda testified he worked in the repeat offender department of the police force (hereafter ROP) and was trying to "find a murder warrant related to Jonathan Guillen." (9RR-45) He stated he made contact with Guillen on December 26, 2012 and arrested him in the middle bedroom of 234 Carmen Place. (9RR-46, 51). In the room Guillen was found, Zepeda testified, without objection, his arrest team found bags of clothing, a notebook containing drawings, and an instruction manual on a Smith and Wesson. (9RR-56-7) Defense counsel's renewed objection on the "search and seizure issue" as to the instruction manual raised in the pretrial Motion to Suppress was again overruled. (9RR-58) Specifically, the manual was for a Smith and Wesson SD40, with instructions on how to disassemble a gun.(9RR-59)

Sylvia Irene Castillo, a manager of client services at IC Solutions testified the company provides telephone services for facilities all over the United States, wherein telephone calls of inmates are recorded. (9RR-64-5) She provided a phone call (State's Exhibit 76) between Guillen and his brother as well as someone named "Yvette."(9RR-67) Defense counsel's objections based on relevancy, T.R.E. 403, 404(b), and improper authentication were overruled. (9RR-68) On the recording, the statements, "I know what got me in here, bro. It's packing the damn pistol, dog, and letting my pride get in the way. Now look at me dog, I feel like

shit, man" were made. (9RR-71). The State rested their case in chief. (9RR-72).

During a hearing outside the presence of the jury, defense counsel, while failing to subpoena certain witnesses, admitted he was ineffective for not doing such, but made last minute efforts to bring CSI Brenda Oliva and Officer Brian Peters to court as witnesses. (9RR-73, 75)

Officer Brian Peters was recalled and testified after seeing photographs of the scene that crime scene tape was blocking the front door of the apartment, in the parking lot, and the actual entrance to the apartment building. (9RR-85) After confirming the integrity of the apartment using yellow crime scene tape , (trying to refute Brittany Garcia's testimony), Peters stated the serial number to the weapon that would have been shipped or purchased in the Smith and Wesson box was HEC 8713. (9RR-98) Peters also confirmed there were PlayStation games and videos on different shelves in the same room where the gun box was found. (9RR-107) Peters noticed there were also PlayStation video games on a table in the living room and on a stand, along with a PlayStation system connected to a television. (9RR-109-11) Peters also showed the jury pictures of the wounds on Garcia, which appeared to be to the right hip in the front of the body, as well as to the buttocks. (9RR-111)

Much Court time and discussion about Guillen's videotaped statement was discussed during the State's Case-in-Chief, but never offered. (9RR-114) Defense

counsel then offered it into evidence under the evidentiary Rule of Optional Completeness, based on the State's playing of Guillen's phone call discussing the offense over the telephone, however the Court sustained the State's objections (9RR-114-6)

Outside the jury's presence, there was heated discussion about defense counsel's attempt to introduce the crime scene video because it showed the tattoo "Phuck It" on the decedent's knuckles and other hand tattoos that "could be gang related.(10RR-5-15)[1] The trial court viewed the original video, then only permitted defense counsel to show the State's redacted version, which delted any view of decedent's hand. (10RR-15)

The Defense' first witness was Brenda Oliva, a crime scene investigator for SAPD, who stated at around 1:12 a.m on December 13, 2012, she recorded a video of the shooting scene as well as a Panoscan. (10RR-17) She related there was a gash in the front door of the apartment above the deadbolt lock. (10RR-21) She also confirmed there was a PlayStation controller on top of the arm of either a couch or "love seat." (10RR-22) She also explained the video did not show any blood drops on the right side of the bedroom, on the wall, or on the floor (10RR-

---

[1]The Assistant District Attorney then argued "the fact that the gang tattoo is there...and appears across the knuckles, below the knuckles and before the middle of the hand, they are all running together. (10RR-12)

36

24-5) She also pointed out there was a pamphlet for a Taurus pistol. (10RR-26).

Lisa Martinez, Guillen's mother, was recalled to testify about a picture of the decedent alive, taken when he was in prison, and already in evidence as State's Exhibit One, but the trial court would not allow testimony to that effect. (10RR-29). Martinez was allowed to say she had seen many of the same type of photo but with different family members. (10RR-29) She also stated she had seen the same types of photos taken of her ex-husband Frank when he was in prison. (10RR-30) She also said she married Frank because "he was in charge of Bexar County," so he could look out for everybody in her family, including Guillen. (10RR-31)

SAPD Sergeant Jesse Salame, currently assigned to the Intelligence Unit, testified he was a detective in the homicide unit who worked on the shooting in this case. (10RR-34) He stated he interviewed Guillen and his mother. (10RR-34) He confirmed that Guillen, when questioned, told Salame his story of what happened while being videotaped. (10RR-28) Defense counsel attempts to inquire from Salame his own statements during Guillen's videotaped statement were not allowed by the trial court. (10RR-43-6) He stated he did not observe Lisa Martinez having any trouble speaking, no struggling with her tongue, no swelling, no blood around her, so no medical treatment was sought by Salame. (10RR-57) He claimed he saw no visible injuries on her except for some hickeys on her neck.

(10RR-58).

Gloria Yhgaira Segura testified she had known Guillen approximately seven years but that the two became "boyfriend/girlfriend" September 16, 2012. (10RR-68) She explained she was living with Guillen at his mother's apartment in December of 2012, including the day before and of the shooting. (10RR-69) She stated she and Guillen took his infant to the hospital the day of the shooting, because the eleven month old child had a 104 degrees fever. (10RR-72) She said after leaving the hospital, she and Guillen traveled back to the apartment and found Lisa Martinez in her bedroom, while Gloria laid down with the baby and Jonathan playing games on the PlayStation, which Guillen did frequently. (10RR-74) She stated she next heard a loud knock on the front door, after which Guillen opened it and asked if his mother knew Ernest was coming over. (10RR-77) She said Guillen then asked his mother if Ernest could enter, to which she responded, "Yes," so Guillen allowed Ernest to enter. (10RR-78) She said she saw Ernest go straight into Lisa's bedroom and close the door. (10RR-79) She indicated she then heard Ernest and Lisa arguing in the bedroom, with Guillen staying in the living room. (10RR-79) Gloria testified she heard Lisa Martinez tell Garcia to "get out," then open her door, but Garcia said "No" and closed the door. (10RR-79) Segura related that it was normal for Garcia and Martinez to fight, "They fight constantly, all the time.

38

(10RR-147, 156) Segura stated Martinez continued to tell Garcia three more times but Garcia also continued to close the door three more times, and say "No" three more times. (10RR-79) Segura was awakened when she heard Guillen say, "Open the door" in a worried voice followed by the door being opened. (10RR-80) Segura testified she heard Guillen repeatedly ask, "Did you hit my mom?" followed by arguing and hearing Martinez say, "He hit me, he hit me." (10RR-81) Segura stood up in the other bedroom's doorway while Guillen was in the open doorway of Martinez' bedroom. (10RR-82) She remembered the apartment was for handicapped people, so she did not believe the bedroom doors did not lock. (10RR-145,8) At some point, Segura stated she told Guillen to "Come back in." (10RR-157) However, Segura stated she did not believe "anything was going to happen." (10RR-158) She stated Garcia was "like, right up in front of Jonathan.," but not in the doorway. (10RR-82) Segura stated she heard Guillen ask again "Did you hit my mom?" to which Garcia laughed but never answered back. (10RR-83) Segura testified she saw Garcia threateningly and aggressively lunge at Guillen with open hands. (10RR-83-4) Segura then held tightly onto the baby and went back into the other bedroom in order to get away from Garcia. (10RR-84) She stated she heard unknown noises and then gunshots but never saw Guillen possessing or firing a firearm. (10RR-85, 168) She also denied handing Guillen a gun. (10RR-172)

39

Segura stated Guillen, scared, then opened the bedroom door where she was and said, "We've got to go," so she and the baby left the apartment. (10RR-85-6) She said that was the first time she had ever seen Guillen scared, but also in shock. (10RR-98) She stated Guillen could not sleep. (10RR-99) The day after, she saw Guillen crying. (10RR-98) Segura said she knew Garcia for as long as he and Martinez were dating but that Segura did not like or feel comfortable being in the same room as Garcia. (10RR-87) Segura remembered Garcia and Martinez arguing often, with Garcia being "controlling about what Lisa did, who she talked and where she went." (10RR-87) She even stated Garcia was not a likeable person for Martinez, or for anyone else. (10RR-128) She also testified she had seen Garcia with a knife. (10RR-88) She related that Guillen had told her that he was afraid of Garcia. (10RR-90) However, she never asked Guillen about the shooting. (10RR-99) She and Guillen then went to Guillen's Aunt Yvette's house and then stayed in a motel for a few days. (10RR-102-3) Segura stated she was scared because the gun that was used belonged to her. (10RR-100) She indicated she bought the weapon at Academy in San Antonio, TX on October 15, 2012 because there had been "a whole bunch of break-ins in the apartment complex." (10RR-105, 110) Attempts to introduce the paperwork indicating the purchase of the weapon were not successful as the trial court sustained the hearsay objection made by the State.

(10RR-107) Segura remembered the gun was a Smith and Wesson .40 caliber. (10RR-108) She admitted Guillen helped her somewhat in deciding which firearm to buy. (10RR-134) She also said she did not keep the gun in the original box, which was in she and Guillen's bedroom, but rather in the hallway closet underneath "a whole bunch of blankets" at Martinez' apartment. (10RR-109, 112) She pointed out there were many PlayStation games and movies located in she and Guillen's bedroom. (10RR-114) She stated she and Guillen, after being driven there by Guillen's brother Julian, had been staying together at the house where and when he was arrested. (10RR-116, 138) She related that after the arrest, the police did not call her, but her father Abel Segura, a retired police officer, received calls from the police because her father knew one of the officers that arrested Guillen. (10RR-117) She stated her father picked her up and she has stayed with him ever since. (10RR-117) Before the trial started, Segura admitted to the defense attorney that she believed Guillen was protecting his mother. (10RR-186)

Before the next witness, Sylvia Irene Castillo, the trial court heard defense objections made based on the lack of notice, as required by T.R.E. 404(b), objections as to the lack of proper predicate to voices on a "jail-recorded" phone call between Guillen and unknown persons, and objections based on the denial of confrontation, and overruled them. (11RR-6-12) Castillo stated she identified

Guillen as making a telephone call from the jail. (11RR-14; Sx 83) The January 13, 2013 telephone call between Guillen and a female was about Gullen's brother getting arrested "in the Valley" with a black and silver "thing" that was in pieces, that looked like a toy, with a tampered serial number as well as a mention of a PlayStation. (11RR-29;Sx 83) The alleged relevancy of the phone call was an attempt to show the jury that Guillen's brother was arrested while transporting a disassembled firearm Guillen used in the shooting, however no witnesses testified to the brother's arrest or to the recovery of what item he allegedly carried or to any serial number discovered.

The State and Defense then both rested and closed their respective cases. (11RR-29). The trial court instructed the jury on the issues of self-defense, defense of a third person, and necessity, but also on provoking the difficulty. (CR-159) After closing arguments, the jury returned a guilty verdict for murder. (11RR-102)

At sentencing, the State read to the jury the enhancement paragraph alleging Guillen had been previously convicted on April 5, 2010, in cause number 2009-CR-4731, in Bexar County, TX, that Guillen had been convicted of the felony of possession of a controlled substance, penalty group one, over four but less than two hundred grams. (12RR-5; CR-6) Guillen's counsel entered a plea of "Not True."

(12RR-5)

Robert Jimenez, a fingerprint expert testified he obtained Guillen's fingerprints earlier in the day and compared them to State's exhibits 86, 87, and 88, which were judgments of Guillen's convictions for Aggravated Robbery (as a juvenile), Possession of a Controlled Substance under four but less than 200 grams (the enhancement paragraph 2009-CR-4731) and for disorderly conduct. (12RR-18-9)

Francisco Basaldua, stated he was "held up at gunpoint" on September 11, 2004 by Guillen. He also stated Guillen pointed the revolver, possibly a Derringer, at a man wearing a gold chain and told him, "Hand it over and nobody gets fucked." (12RR-28) Basaldua testified Guillen then pointed the gun at him and wanted the cash in the register., so he gave it to Guillen. (12RR-28-9)

Olivia McDougall, Ernest Garcia's mother, testified he was forty-four when he died. (12RR-33) She stated losing her son was, "the hardest thing for me to lose him. And the impact, it impacted my life. It's unbearable. And it hurts each and every day of my life because he's no longer here.. I miss his smile." (12RR-34) After showing a picture of Garcia with his family, it was revealed the picture was taken while he was in prison. (12RR-36)

Bexar County Deputy Sheriff Nick Rocha, a detention officer who worked

43

in the Bexar County jail stated he also worked in a Classifications Section as a gang intelligence Officer, specifically investigating the Mexican Mafia (12RR-39, 56) He observed tattoos on Guillen that were consistent with him being a member of the Mexican Mafia, however when specifically asked by Rocha, Guillen stated he was an Ex-member of the Mexican Mafia, meaning he was no longer in good standing with the gang. (12RR-61) Rocha explained that because of this, Guillen could not be housed in the jail with active members because Guillen's life would be in jeopardy. (12RR-62) Rocha claimed Guillen told him he became affiliated with the gang in 2009 when he was recruited by other members. (12RR-62) In addition, Rocha claimed Guillen stated he was raised in Chicago, IL, and that when he was younger he had an affiliation with a "Vatos Locos Trece," which Rocha "assumed [was] a street gang. (12RR-63) Without objection, Rocha testified that the Mexican Mafia was a criminal organization that "push their agenda through intimidation and violence, different things to push their agenda, whether it be on the street or in prison or jail. (12RR-63) Rocha also identified the tattoos on Garcia's body as being related with the Tango Oregon gang, although Rocha also noticed an Aztec Princess tattoo which is "sometimes the art...used by the Mexican Mafia," but Rocha needed more context with Garcia's tattoos and his history to make a conclusion. (12RR-81-2). Rocha made it a point to say that "at the current

44

time Mexican Mafia and Tango Orejons are warring where we've had riots in the facility Bexar County jail]." (12RR-85) Rocha did explain that when young inmates come into prison they affiliate with a gang for self-protection in order not to become "a target." (12RR-86)

SAPD Detective, a member of the Repeat Offenders Program (ROP), Gary Mucho stated he had contact with Guillen on March 6, 2009 because he was "a wanted person," but that Guillen ended up being arrested for a drug possession case. (12RR-93) Mucho stated when Guillen was located, he to run away from the police into his apartment and locked the door of the back bedroom, but the police followed him into the apartment and kicked the door down where they found Guillen with his hands up. (12RR-96-7) In the room, police found a pistol, other additional holster with more bullets, a magazine and what appeared to be approximately 14.5 grams of cocaine. (12RR-97) Guillen was then arrested for the cocaine as well for being a felon in possession of a firearm. (12RR-102) Mucho also remembered speaking to the Guillen's mother at the scene. (12RR-103)

Alexandra Liz Hernandez testified she was Guillen's ex-girlfriend, but that they "had" a child together named Jonathan Jose Guillen Jr. (12RR-105-6) She said she and Guillen were together in 2011 for a "couple of months but the baby was born on January 30, 2012. (12RR-106) She claimed she di not have a good

45

experience with Guillen after the baby's birth because Guillen "beat her." (12RR-107) She claimed he "beat me up, choked me, he kicked me, he punched me." (12RR-107) She also said that while she did not know why, Guillen would threaten to kill her with a handgun and threaten her parents if she ever did anything against him. (12RR-109) Nonetheless Hernandez stayed with Guillen because she loved him. (12RR-110)   She claimed Guillen would point a handgun close to her head in front of her two daughters. (12RR-111) She also claimed Guillen admitted to her that he was proud of being a member of the Mexican Mafia (aka "EME"). (12RR-112) She claimed Guillen "took their son away from her." (12RR-115) She claimed she was her son "a couple of times" after that but she "was threatened that if I would go and see my son or that if I set him up in any kind of way that he was going to try to kill my parents...just to get me back. I don't know," but she never told anybody about the situation. (12RR-122,4) She admitted she never once called the police about any of the so-called beatings because she "was scared." (12RR-123) She admitted she never brought up any of these stories until the end of December 2012 or January 2013 when she told the District Attorney's Office. (12RR-125) She revealed that the authorities would not return the child to her, that she had to go through Child Protective Services in order to have access to her child. (12RR-128)   Yet, the Defense brought pictures showing her feeding the

baby at the doctor's office with Guillen as well as a picture of she, Guillen, and their baby. (RR12-132-3; Def.Ex 48-9) The witness reiterated that she did not remember "a lot of things...I try to keep everything out." (12RR-133) She revealed Guillen "took the baby to all his doctor appointments." (12RR-135) She denied ever taking the infant to the "WIC" office in order to receive government assistance, or having a conversation about that incident with Yvette, Guillen's Aunt. (12RR-137)  She admitted to owning a Taurus handgun as well as a related pamphlet.[2] (12RR-142) She claimed Guillen took both the Taurus and the pamphlet. (12RR-142) She claimed Guillen gave her a week to leave after the baby was born, but when he found out Hernandez was living with his aunt, he started beating her up and choking her. (12RR-145-51) She admitted to staying with Guillen and the baby even after Guillen allegedly beat her up in the past.(12RR-158)

Forensic scientist from the Bexar County Crime Laboratory Mark Florence stated the amount of cocaine found during Guillen's drug arrest was 12.985 grams.

Bexar County deputy Sheriff Reynaldo Villarreal, a detention officer working at the bexar County jail testified that on July 22, 2013, he came into contact with Guillen. (12RR-177) The deputy stated he saw Guillen grab a mop

---

[2]Evidence was previously introduced that a pamphlet for a Taurus weapon was found.

47

handle, run upstairs and struck another inmate, Eric Flores, "up the top of his head," with the plastic top, causing a cut and bleeding. (12RR-178) Flores and Guillen had a physical confrontation immediately following. (12RR-185) Apparently Guillen had complained that Flores had stolen his commissary items and wanted to make a report to a higher ranking deputy. (12RR-189)

Detention Supervisor Christopher Joseph Walsh interviewed Guillen about the "commissary incident" when Guillen told him he was angry about his commissary being stolen and that is why he hit Flores with the mop. (12RR-195)

Crstal Garcia, Ernest Garcia's daughter, testified she was close to her father and that his death has affected her "a lot. I's hard. It still feels like it was yesterday when I lost him. I miss him so much." (12RR-197) The State then rested it's punishment case. (12RR-198)

Yvette Sepeda, Guillen's Aunt, his Mother's little sister, stated she had known Guillen all his life, as soon as he was born in Illinois on November 22, 1989. (13RR-8) She explained she, Guillen, Lisa Martinez, her sister, and his older brother Julian moved to Texas with Sepeda's mother. (13RR-9) She related that she and Guillen were "very close." (13RR-11) She stated Guillen had a "very hard upbringing because his mother started sniffing paint when she was a teenager, after Guillen was born. (13RR-11-2) Sepeda said Guillen was in diapers when Martinez

48

was sniffing paint. (13RR-12) Guilloen's mother would neglect them, would not feed or bathe them, or change their clothes, which cause the grandmother to go pick up the boys to care for them. (13RR-13) Sepeda related that the brothers would either call her or her mother because their mother was not taking care of them properly. (13RR-13) She remembered picking up the kids and while washing their clothes, she would notice spray paint on the clothes. (13RR-14) She related Guillen and his brother would hide the spray paint from their mother so she "would stop getting high." (13RR-14) Sepeda stated Martinez would walk around hallucinating, not eat, but would rather sniff paint until "she would start throwing up" and she would "pee on herself." (13RR-15) She said she noticed the boys were running around fending for themselves, "or sometimes they were just in the streets all hours of the night. (13RR-15) In fact, Sepeda testified that Child Protective Services (CPS) became involved in the early 90's when Guillen was five or six years old. (13RR-16) Sepeda related that even after CPS intervened, the situation with Martinez continued, no matter daytime or night time, when Guillen and his brother were locked out of the house because Martinez was punishing them for hiding her spray paint. (13RR-16) CPS would place the boys with their grandmother when Martinez was "caught getting high." (13RR-18) However, when Martinez would temporarily stop her drug use, the boys would go back to

live with Martinez. (13RR-18) Guillen's mother would not change her behavior, however, as she would start to "get high" again. (13RR-18) CPS intervened again because Guillen and his brother were not going to school, but were filthy clothed when they did attend. (13RR-19) Even during this time period, Guillen and his brother would try to take care of their mother by feeding her. (13RR-61) Guillen and his brother were taken away from Martinez and placed in foster care. (13RR-19) Sepeda noted that the brothers were very close. (13RR-20) Sepeda noted that Martinez' mother's behavior continued "throughout their [the brothers] whole childhood and most of their adulthood." (13RR-20) Sepeda also explained that Martinez had multiple boyfriends, meaning that she had "more than one boyfriend at one time. (13RR-20) Sepeda clarified that Guillen's mother would have many, different, simultaneous boyfriends, who would live with the brothers all throughout Guillen's life. (13RR-21). Shockingly, when Guillen was between eleven years old and thirteen years old,, he came home and saw his mother "in Bed" with his teacher, which disturbed him, caused him to be ashamed and embarrassed, so he did not want to go back to school. (13RR-22) Sepeda also explained that Martinez, although living in Harlingen, TX, would "move around a lot," because she kept getting evicted due to her sniffing paint. (13RR-23) Sepeda also described an incident when Guillen and his brother, who were close to six years old, were trying

to heat up an old pizza in a pizza box in the oven (while Martinez was asleep) that ended up burning down the house where they lived. (13RR-25) Sepeda remembered Martinez trying to coach the kids into telling the fire marshal that the fire was caused by them playing with matches, or that she would go to jail if they found out she was asleep and high while the boys were trying to feed themselves by heating up pizza in a box in the oven. (13RR-25-6) Sepeda also related that there were other incidents when Martinez would "get the boys to lie so she would not get in trouble." (13RR-26-7) Sepeda testified Martinez would physically abuse Guillen as a boy with wire hangers; she would throw brushes; hit him with a belt and buckle. (13RR-29) Sepeda related that in 2002, CPS brought a lawsuit against Martinez to terminate her parental rights, but Martinez complied with all the requirements and the case was closed. (13RR-31) Despite the completion of CPS' program, along with giving birth to another child, Martinez went back to her old ways and "started getting high again," as well as neglecting Guillen of food and clothing. (13RR-31) Sepeda stated that Guillen then started "hanging out in the streets," with his friends and his brother, "running around, smoking weed, and drinking." (13RR-32) Sepeda admitted she was also with Guillen, when they would sleep during the day and "in the streets at night." (13RR-32) She said Guillen stopped going to school around the seventh grade. (13RR-33) Despite CPS

once again becoming involved, Martinez did nothing to make Guillen get back in school. (13RR-33) Guillen then started getting into trouble with the law, which ultimately landed Guillen in the Texas Youth Commission (TYC). (13RR-34) After Guillen was released from TYC, he went back to live with his mother, Martinez, then living in San Antonio, who continued to "get high." (13RR-38) Sepeda related Guillen still had no structure at home so he continued living the way he did before, by hanging out with friends. (13RR-39) Sepeda testified Guillen was arrested again for "a drug charge," which landed him in prison. (13RR-40) Sepeda noticed a change in Guillen after he was released from prison, that he had become more mature. 913RR-41) However, she noticed he was still "real worried and stressed," specifically about paying the rent and other bills, plus taking care of his mother, washing clothes, and caring for Martinez and his new younger brother and sister. (13RR-41) Sepeda revealed that Guillen and Alexandra Hernandez "had" a son in January of 2012. (13RR-42) However, Guillen raised his son as a single father after the mother left, and moved in with the child and Sepeda at Martinez' apartment (13RR-43-4) Sepeda stressed that she never saw any occasions where Guillen beat or threatened his mother or Hernandez. (13RR-45, 49)

On the night of the shooting, Sepeda remembered Guillen knocking on her

door at 1:30 a.m. so she let him, Gloria and Jonathan Jr. inside of the residence because that is where Guillen lived. (13RR-66)

The Defense played a video from July 17, 2012 showing Guillen, his brother Julian, Alejandra, and the baby, getting along-- with Guillen and Alexandra having a friendly, romantic time. (13RR-75;Def. Ex 64)

On cross-examination, the prosecutor, without objection, testified to Sepeda about an alleged time when Guillen chased Julian around the house with a knife, along with another instance that Guillen allegedly stabbed a knife through Julian's door. (13RR-84). The prosecutor also testified to Sepeda about an alleged instance where Guillen spit in Martinez' face. (13RR-85) Sepeda did admit that Guillen associated with the "East Side of Harlingen" gang. (13RR-86) The prosecutor also testified to Sepeda that Guillen was a good student in the 8th grade while attending Gutierrez Middle School, however all Sepeda could say was, "...I don't know about his school as far as his grades or–the only thing I know is he dropped out of school in junior high at a very young age." (13RR-88) The prosecutor continued testifying to Sepeda that Guillen was attending school before he was "incarcerated" at TYC. (13RR-88-9) The prosecutor also "testified" to Sepeda that "after the agg [sic] robbery where he [Guillen] expressed no empathy or remorse for the victim?" Sepeda answered that she believed Guillen would feel bad for the

victim that Guillen "held up at gunpoint." (13RR-91) However the prosecutor continued to "testify" to Sepeda when he stated, "Would it surprise you to know that a—that an actual psychiatrist interviewed him on that exact same question and he [presumably Guillen] said he had no empathy or remorse?" (13RR-91)

Dr. Michelle Little, a professor employed at the University of Texas psychology department testified that she specializes in child and adolescent developmental psychopathology and child psychopathology, "which is essentially child mental health disorders and development." (13RR-136) She explained that she studied the understanding of how children and adolescents develop problems, psychosocial and mental health problems, in the context of development "so how they kind of follow track with respective to developmental outcomes or potentially they experience some particular kind of problem and how that affects their development." (13RR-136) Dr. Little stated she performed a review of Guillen's case records from Child Protective Services, from his confinement at TYC, from his Cameron County juvenile case record, as well as Guillen's intake records and psychological evaluations from TYC. (13RR-139) Dr. Little stated she found many traumatic experiences that Guillen experienced that were not typical for "typically developing children" which leaded to the kinds of behavior Guillen exhibited. (13RR-140) She said the degree and chronicity of Guillen's neglect were very

alarming and had "particularly worse effects during the school age and adolescent period taking the child and the adolescent more time to recover from those problems. Undercutting their ability to regulate their emotions and to regulate themselves under stress" (13RR-140) Dr. Little explained Guillen had problems with hearing and speaking until he was six years old, which set him behind and became a challenge for him. (13RR-141) Moreover, due to Guillen's multiple attachment disruptions caused by his being moved from at least five different locations, and his exposure to a history of violence affected his behavior as an adult. (13RR-142) She said that Guillen developed his tendency towards delinquency when he was thirteen years old, as Guillen would return to his mother after she was "cleared" by CPS but that Martinez would continue to use illegal drugs and neglect Guillen, which negatively influenced him. (13RR-145) She testified that she believed the most remarkable issue was that Guillen had three different father figures between infancy and fifteen years old, with all three figures no being stable providers. (13RR-147) She noted the first father figure beat Guillen's mother, so Guillen, as a witness to violence saw that as giving himself permission to be violent. (13RR-147) Dr. Little also explained that Guillen was very stressed as a child when he saw his mother sniff paint but as he became older, he began to "pick up the habit." (13RR-149) Little explained that it is known that

the combination of low monitoring, overly permissive combined with low care, and inadequate support for children relates to some of the worst outcomes in terms of delinquency and offending. (13RR-149)

The Defense and State then rested and closed their respective cases. (13RR-180) After hearing the Court's Charge and the arguments of the attorneys, the jury sentenced Guillen to serve 99 years in prison. (14RR-39)

## POINT OF ERROR ONE: THE STATE'S CLOSING ARGUMENT DURING THE PUNISHMENT PHASE WAS OUTSIDE THE EVIDENCE AND DENIED GUILLEN'S RIGHT TO A FAIR TRIAL DURING THE PUNISHMENT PHASE

### SUMMARY OF THE ARGUMENT

The Prosecutor's closing argument during the punishment phase likened Guillen to Adam Lanza, the perpetrator who killed twenty school children and six adults at Sandy Hook Elementary. (14RR-23) The statement was outside the four areas of permissible argument and clearly outside any evidence adduced during the trial. As such, the Defendant is entitled to a new punishment hearing.

### ARGUMENTS AND AUTHORITIES

The "purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable

conclusion based on the admitted evidence alone." Fant-Caughman v. State, 61 S.W.3d 25, 28 (Tex. App—Amarillo 2001, pet. refused). Jury argument must fall within one of four general areas: "(1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to opposing counsel's argument; or (4) plea for law enforcement." Id. (citing Cantu v. State, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)). If any argument does not fall into one of the four categories of proper argument, it is rather a plea for abandonment of objectivity." Brandley v. State, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985) (en banc). cited in Ramirez v. State, 2015 Tex. App. LEXIS 6743 (Tex. App. Corpus Christi July 2, 2015)

## Standard of Review

In evaluating the argument, appellate courts look to the factors established by the Court of Criminal Appeals in Mosley v. State. Franklin v. State, 459 S.W.3d 670, 2015 WL 1043804, at *10 (Tex. App.—Texarkana March 10, 2015, no pet.) (citing Mosley, 983 S.W.2d 249 (Tex. Crim. App. 1998)). The factors are: "(1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)." Id. The appellate court will analyze the alleged harm under T.R.A.P. 44.2(b), which

57

requires that any error not affecting substantial rights is to be disregarded. TEX. R. APP. P. 44.2(b). If it is determined that the State's comments were improper jury argument, the trial court's erroneous overruling of Guillen's objection is also not reversible error unless it affected Guillen's substantial rights. TEX. R. APP. P. 44.2(b); Martinez v. State, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000); Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g).

## ARGUMENTS AND AUTHORITIES

In the present case, the following comment was made by the prosecutor in his rebuttal closing argument during the punishment:

"**Mr. Neidhardt**: ....These are the people that are–cause problems in our society. The sociopaths who go out and shoot up kindergartens, fourth grades–
**Mr. Camara**: Objection, Your Honor. That's improper argument. There's been no evidence of having anything to do with shooting up fourth graders.
**The Court**: All right. Sustained
**Neidhardt**: People–
**Camara**: Your Honor, I ask that he be instructed not to argue that.
**The Court**: All right. Your objection is sustained. I'm sure he won't argue it again.
**Camara**: I move for a mistrial.
**The Court**: Denied"
(14RR-23)

Clearly the prosecutor was comparing Guillen to Adam Lanza, the infamous shooter who marched into the Sandy Hook Elementary School in Newtown,

Connecticut and fatally shot 20 children and 6 adult staff members. Barron, James (December 15, 2012). "Children Were All Shot Multiple Times With a Semiautomatic, Officials Say". The New York Times. (Retrieved December 17, 2012). It is clear that the Sandy Hook massacre was an event that deeply affected millions of Americans.

There was clearly no relation whatsoever between the Sandy Hook massacre and the crime Guillen of which Guillen was convicted, which was the shooting of a man who was intoxicated and attacking his mother.

"It is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper." Brown, 270 S.W.3d at 570 (internal citations omitted). "The arguments that go beyond these areas too often place before the jury unsworn, and most times believable, testimony of the attorney." Alejandro, 493 S.W.2d at 231. Consequently, error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. Brown, 270 S.W.3d at 570.

The State's comments do not fall within any of the parameters set forth by the Court of Criminal Appeals. The comparison of Guillen to Adam Lanza is not unlike comparing defendants to other notorious criminals. Brown v. State, 978

59

S.W.2d 708, 714 (Tex. App.--Amarillo 1998, pet. ref'd) (comparing defendant to Jeffrey Dahmer, John Wayne Gacy, and Ted Bundy improper); Massey v. State, No. 04-99-00040-CR, 1999 Tex. App. LEXIS 7372 at *9 (Tex. App.--San Antonio 1999, pet. ref'd) (comparison to Killeen Luby's shooting and New York subway shooting erroneous); Gonzalez v. State, 115 S.W.3d 278, 284-85 (Tex. App.--San Antonio 2003) (comparison between defendant and Osama Bin Laden and Al Qaida improper); Stell v. State, 711 S.W.2d 746, 748 (Tex. App.--Corpus Christi 1986, no pet.) (comparison to Lee Harvey Oswald improper). These types of arguments that reference matters that are not in evidence and may not be inferred from the evidence are usually, "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." Borjan v. State, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990). In examining challenges to jury argument, appellate courts consider the remark in the context in which it appears. Gaddis v. State, 753 S.W.2d 396, 396 (Tex. Crim. App. (1988).

Despite Guillen's prior convictions and the facts surrounding the homicide, this statement was so outrageous that it, no doubt, affected Guillen's substantial rights. He was sentenced to ninety-nine years in prison, which, under Texas parole law, equates to a sixty-year sentence, where Guillen is not eligible for release on parole until he has served thirty calendar, day-by-day, years. TX Code Crim Pro.

37.07. The prosecutor dominated the trial and was effective in his prosecution of the case. However, he committed borderline prosecutorial misconduct when he compared Guillen to the mass murderer Adam Lanza. Thus, Guillen was denied his right to a fair trial, as guaranteed by the United States' and Texas' Constitutions.

## POINT OF ERROR TWO: THE TRIAL COURT ERRED IN FAILING TO GRANT A MISTRIAL BASED ON THE PROSECUTOR'S COMMENT THAT COMPARED GUILLEN TO MASS MURDERER ADAM LANZA

### Summary of the Argument

After the prosecutor made the comment cited in point of error one, defense counsel's objection was sustained, the jury was instructed accordingly, but the trial court denied counsel's request for a mistrial. (14RR-23) The trial court erred by not granting a mistrial.

### Standard of Review

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) and Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003)). Only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative

61

instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant may a motion for mistrial be granted. Bauder v. State, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996). Appellate courts review a trial court's denial of a motion for mistrial under an abuse of discretion standard. Hawkins, 135 S.W.3d at 77. When a mistrial is denied following improper jury argument, appellate courts balance three factors: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of the verdict absent the misconduct. Hawkins, 135 S.W.3d at 77.

Arguments and Autorities

Guillen hereby reasserts the arguments and authorities set out under Point of Error Number One. No doubt the trial court, nearing the end of a two week trial, was going to grant a mistrial–that is just the practicality of jury trials. However while the trial court did admonish the prosecutor, she failed to take into effect the overwhelmingly inflammatory nature of the argument and the images the prosecutor conjured up in the jurors' minds when he made the reference to Guillen being one of those"people," sociopaths who shoots up kindergartens and fourth graders. The trial court clearly abused her discretion when she failed to grant Guillen's request for a mistrial.

**POINT OF ERROR NUMBER THREE: THE TRIAL COURT ERRED**

**WHEN DISALLOWING EVIDENCE UNDER THE "FIRST AGGRESSOR" THEORY IN GUILLEN'S SELF-DEFENSE, THEREBY DENYING HIM A FAIR TRIAL AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT OF THE UNITEd STATES CONSTITUTION**

## SUMMARY OF THE ARGUMENT

Guillen's main theory at trial was that he shot the decedent either in self-defense, defense of his mother, or as a matter of necessity. On several occasions, Guillen attempted to introduce evidence of specific acts of violence in order to show the decedent, Garcia's, violent character. Such attempts were not allowed into evidence by the trial court.[3] Garcia had a long history of violence, specifically assaults, and the trial court erred in disallowing Guillen to bring them in front of the jury.

## STANDARD OF REVIEW

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). Appellate courts will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. See id. The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any

---

[3]As the law in this area is well settled, rather than raise separate points of error, the complained of incidents will be brought alphabetically

theory of law applicable to the case. Willover v. State, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). Additionally,. appellate courts must review the trial court's ruling in light of what was before the court at the time the ruling was made. Id.

Moreover, non-constitutional error will not result in relief unless it affected one of appellant's "substantial rights." See Tex. R. App. P. 44.2(b); Wilson v. State, 90 S.W.3d 391, 393 (Tex. App.-Dallas 2002, no pet.). An error affects an appellant's substantial right when it has a "substantial and injurious" effect or influence in determining the jury's verdict. Wilson, 90 S.W.3d at 393. Thus, despite any error in an appellant's case, appellate courts must affirm his conviction if, after examining the record as a whole, the court is left with the fair assurance that the error did not influence the jury or influenced the jury only slightly. See id.

## ARGUMENTS AND AUTHORITIES

"When a defendant in a homicide prosecution raises the issue of self-defense, he may introduce evidence of the deceased's violent character. Tex. R. Evid. 404(a)(2); Tate v. State, 981 S.W.2d 189, 192-193 (Tex. Crim. App. 1998); Thompson v. State, 659 S.W.2d 649, 653 (Tex. Crim. App. 1983). Specific acts of violence may be introduced to demonstrate the reasonableness of the defendant's fear of danger or to demonstrate that the deceased was the first aggressor. Torres II,

71 S.W.3d at 760. However, such specific acts of violence are admissible only to the extent that they are relevant apart from showing character conformity. Id. This Court has held that specific, violent acts are relevant apart from showing character conformity in the context of proving that the deceased was the first aggressor by demonstrating the deceased's intent, motive, or state of mind. Id. Because the specific act is probative of the deceased's state of mind or intent, the witness must know, but the defendant need not know of the act. Torres, 71 S.W.3d at 761; Jenkins v. State, 625 S.W.2d 324, 326 (Tex. Crim. App. 1981).

There must be some evidence of aggression by the deceased during the events that gave rise to the criminal charges in the case before the defendant may introduce evidence of a prior specific violent act that tends to explain the deceased's later conduct. Torres II, 71 S.W.3d at 761." [As quoted in Torres v. State, 117 S.W.3d 891, 894-895 (Tex. Crim. App. 2003)]

A. The Trial Court Erred In Disallowing Certified Judgments of Garcia's Prior Convictions

During the Defense's Case-in-Chief, Guillen made an offer of proof as to Garcia's prior convictions. (10RR-200 ; Def. Ex. 42-47) Defense Exhibit 42 contained a certified copy of an indictment and a judgment for a felony conviction of an enhanced Assault, cause number 2001-CR-0376, out of the 175th District

Court, Bexar County, wherein Garcia pleaded guilty to intentionally, knowingly, and recklessly assaulting Valerie Casillas by striking her with his hand and was sentenced to serve two years imprisonment in the Texas Department of Criminal Justice, Institutional Division. (Def. Ex. 42) Defense Exhibit 43 was a certified copy of an indictment for another felony Assault, enhanced by a prior conviction for assault, in cause number 2007-CR-6729, out of the 290th District Court, which alleged Garcia caused bodily injury to Valerie Casillas. Also contained in the indictment were two enhancement paragraphs showing Garcia had been convicted in case number 96 CR4830 for Driving While Intoxicated 3d in 1997, as well as another Assault Family 2d conviction in 2001CR0376 in 2001. (Def. Ex. 43) Said exhibit also showed that it had been dismissed. Id. The dismissal indicated that Defense exhibit 43 had already been taken into consideration in Garcia's plea bargain contained in Defense Exhibit 44. Defense Exhibit 44 contained an Information and Judgment in cause number 2005-CR-8482W, out of the 175th District Court, wherein Garcia was convicted of causing bodily injury to Jonathan Villareal, a member of his family and household, by striking Villareal with Garcia's hand and sentenced to serve eight years imprisonment. (Def. EX. 44) Defense exhibit 45 contained a certified copy of the Information, Judgment, Docket Sheet, and various Court file documents in case number 940870, filed in

County Court at Law No. 7. Garcia pleaded no contest to causing bodily injury to Valerie Casillas on or about August 15, 2004, by striking her with his hand, pulling her hair with his hand, and grabbing her with his hand. (Def. Ex. 45) Garcia was sentenced to 4 days of imprisonment. Id. Defense exhibit 46 contained certified copies of the Information, Judgment, docket sheet, as well as various documents from the County Court at Law No. 7, case number 891481, court file. (Def. Ex. 46) In that case, Garcia pleaded guilty to causing bodily injury on June 8, 2003 to Valerie Casillas by striking her with his hand, and was sentenced to serve sixty days in jail plus a $500 fine and court costs. (Def. Ex 46) Defendant's exhibit 47 contained certified copies of the entire County Court at Law no. 7 file in case number 606443, wherein Garcia pleaded guilty to causing bodily injury on April 20, 1995 to his sister Cynthia Garcia by striking her with his hand, to wit, by punching her in the head and arms causing bruising and pain to her head and arms. (Def. Ex. 47) He was sentenced to serve four months in jail. Id.

A defendant also may introduce evidence under Rule 404(b) of a "victim's prior specific acts of violence when offered for a non-character purpose — such as his specific intent, motive for an attack on the defendant, or hostility — in the particular case." Ex parte Miller, 330 S.W.3d at 620; see Tex. R. Evid. 404(b), 60 Tex. B. J. 1134 (1998, superseded 2015). "As long as the proffered violent acts

explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant." Torres, 71 S.W.3d at 762. "The proper predicate for the specific violent prior act by the deceased is some act of aggression that tends to raise the issue of self-defense, which the violent act may then help clarify." Torres v. State, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003) (emphasis in the original); Allen v. State, 2015 Tex. App. LEXIS 8144, 34-35 (Tex. App. Houston 14th Dist. Aug. 4, 2015).

While the trial court considered the judgments, she stated, "...I know they talk about the Torres case, but the Torres case, but the other acts in the Torres case are pretty closely related to the actual murder...that's in question and I don't find that same connection with regard to putting in judgments from prior convictions in this case, so I'm not going to allow that." (10RR-197) The exhibits in question were not merely judgments, but also contained the indictments, alleging the facts of which formed the basis of the convictions.(10RR-200) The trial court was made aware of such, yet still did not allow the five exhibits into evidence. (10RR-197)

Because the Defense exhibits clearly showed the violent character of the decedent towards men and women, the jury was deprived of relevant evidence that

would have had a significant impact on the verdict. As such, Guillen's substantial rights were affected and he was denied a fair trial under the Fourteenth Amendment of the United Stated Constitution. Had the jury known how violent Garcia truly was, Guillen defenses of self-defense, defense of a third person, and necessity would have been bolstered by the knowledge that Guillen was dealing with a dangerously violent man. The jury was only allowed to hear testimony from Guillen's mother, that he was beating her up. However, had the jury heard his violence spanned over decades of time, certainly Guillen would have had a stronger defense. The trial court abused its discretion by denying the introduction into evidence Defense Exhibits 42-47.


**POINT OF ERROR FOUR: THE TRIAL COURT ERRED BY INCLUDING A "PROVOKING THE DIFFICULTY" INSTRUCTION IN THE JURY CHARGE**

SUMMARY OF THE ARGUMENT

During the charge conference, the State requested, and the trial court included a charge on "provoking the difficulty," which was not supported by the evidence under any stretch of the evidence introduced during the trial.


STANDARD OF REVIEW

69

"Not all jury-charge errors require reversal. In Almanza v. State, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g), the Court of Criminal Appeals explained how reviewing courts should determine if a charge error requires reversal. The court should first determine if the defendant objected to the erroneous charge. If he did not, then he must show that the error was "fundamental" and that he suffered "egregious harm." "This is a high and difficult standard which must be borne out by the trial record."

If, however, the defendant did object at trial, then he will obtain relief if the record shows that he suffered "some harm." This analysis requires a reviewing court to consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. This less-stringent standard still requires the reviewing court to find that the defendant "suffered some actual, rather than merely theoretical, harm from the error." In the past, it has sometimes been stated that the defendant must prove that he suffered "some harm." That is not accurate. Neither the State nor the defendant has a burden to prove harm. In Almanza, the court stated,

'If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which means no more than that there must be some harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.'" (as quoted in Reeves v. State, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)

70

## ARGUMENTS AND AUTHORITIES

In Guillen's case, there was no scintilla of evidence to allow a jury instruction on provoking the difficulty. The undisputed evidence was that only after Guillen heard his mother yelling in her bedroom, after Garcia was inside, did Guillen go to her room, see Garcia attacking Martinez and then obtain a firearm and point it at Garcia, who then lunged at Guillen, followed by Guillen shooting Garcia. Yet, the trial court erroneously instructed the jury on "provoking the difficulty:"

"A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is uses, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force." (CR-159) Further in the jury instructions, the trial court, in the application paragraph, following the previous quoted language, included:
(4) Jonathan Guillen did not provoke Ernest Garcia's use or attempted use of unlawful force, or, if he did, Jonathan Guillen abandoned the encounter or clearly communicated to Ernest Garcia his intent to do so reaqsonably believing he could not safely abandon the encounter, and Ernest Garcia nevertheless continued or attempted to use unlawful deadly force against Jonathan Guillen and/or Lisa Martinez..."
(CR-169)

Again in the charge, the trial court included the language:

"(4) Jonathan Guillen provoked Ernest Garcia's use or attempted use of unlawful deadly force, and Jonathan Guillen did not abandon the encounter or did not clearly communicate to Ernest Garcia his intent to do so reasonably believing he could not safely abandon the encounter,; or

71

(5) Jonathan Guillen provoked Ernest Garcia's use or attempted use of unlawful deadly force, and although Jonathan Guillen did abandon the encounter or clearly communicate to Ernest Garcia his intent to do so reasonably believing he could not safely abandon the encounter, Ernest Garcia did not thereafter continue or attempt to use ulawful force against Jonathan Guillen and Lisa Martinez" (CR-171)

"If not called for by the facts, a charge on provoking the difficulty constitutes an unwarranted limitation on the right of self-defense." Reeves v. State, 420 S.W.3d 812,819 (Tex. Crim. App. 2013). In Reeves, the court agreed with the court of appeals that "[t]he provocation instruction's presence in the jury charge implied that there was some evidence to support every element of the provocation doctrine when there was not."

Reeves,, supra; see also McCandless v. State, 42 Tex. Crim. 58, 57 S.W. 672, 675 (Tex. Crim. App. 1900) ("however groundless the [provocation] charge may be, coming as it does from the court, it is calculated to make the jury believe that, in the opinion of the judge, there was evidence tending to show that appellant brought on the difficulty for the purpose of slaying his adversary and consequently such an instruction, not authorized by the testimony, is calculated to injure or impair the rights of the defendant."). As trial counsel timely objected to the inclusion of the "provoking the difficulty" charge, all that is needed to be shown is some harm. (Citation omitted). The Reeves case is directly on point with Guillen's, thus the trial court erred in including the "provoking the difficulty" charge to the jury.

72

## PRAYER

WHEREFORE, PREMISES CONSIDERED Appellant Jonathan Guillen respectfully prays that his Honorable Court reverse his conviction and grant a new trial as to both phases of the trial, or in the alternative, as to the punishment phase.

Respectfully submitted,

CAMPION & CAMPION

ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza
San Antonio, Texas 78205
Telephone No. 210/227-5161
Telecopier No. 210/229-1243
alexjoss@yahoo.com
cindy@campionlawfirm.com

ALAN BROWN
State Bar 03090000
222 Main Plaza E
San Antonio, TX 78205
Telephone 210/227/5103
Fax 210/225/4851
alan@brownandnorton.com
cyndi@brownandnorton.com
ATTORNEYS FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the following Brief for

Appellant was delivered to the Bexar County District Attorney's Office on this

17 day of August, 2015.

ALEX J. SCHARFF